# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

MARIA D. HERNANDEZ, FERNANDO SALAZAR

v.

SERVIS ONE, INC., ET AL.

§
§
§    Civil Action No. 4:15-CV-596
§    (Judge Mazzant/Judge Nowak)
§
§

## MEMORANDUM ADOPTING IN PART REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Came on for consideration the reports of the United States Magistrate Judge in this action, this matter having been heretofore referred to the Magistrate Judge pursuant to 28 U.S.C. § 636. On February 2, 2017, the report of the Magistrate Judge (Dkt. #98) was entered containing proposed findings of fact and recommendations that Defendant Servis One, Inc.'s Motion for Summary Judgment (Dkt. #56) and Objections to Plaintiffs' Sur-Reply and Motion to Strike (Dkt. #79) each be granted in part and denied in part. Further, on February 6, 2017, the report of the Magistrate Judge (Dkt. #101) was entered containing proposed findings of fact and recommendations that Defendant Carrington Mortgage Services, LLC's Motion for Summary Judgment (Dkt. #55) and Objections to Plaintiffs' Summary Judgment Evidence and Reply to Plaintiffs' Response to Motion for Summary Judgment (Dkt. #78) each be granted in part and denied in part. Having received the reports and recommendations of the Magistrate Judge (Dkt. #98; Dkt. #101), having considered each of Defendants' timely filed objections (Dkt. #112; Dkt. #114), Plaintiffs' responses thereto (Dkt. #117; Dkt. #130), each of Plaintiffs' timely filed objections (Dkt. #113; Dkt. #115), and Defendants' responses thereto (Dkt. #116; Dkt. #118), and having conducted a de novo review, the Court is of the opinion that the Magistrate Judge's reports (Dkt. #98; Dkt. #101) should be adopted in part and rejected in part as set forth below.

## RELEVANT BACKGROUND

Plaintiffs Maria D. Hernandez and Fernando Salazar executed a Note and Deed of Trust (collectively the "Loan") with EquiFirst Corporation on or about October 29, 2007, to purchase property located at 5904 Legend Lane, The Colony, Texas 75056 ("Property") as a home. EquiFirst later transferred the Loan to Bank of New York Mellon Trust Company National Association, as Grantor Trustee of the Protium Grantor Trust ("BONY"). From approximately July 20, 2010, to October 2012, BONY owned the Loan and retained Servis One, Inc. ("BSI") to service it. BSI's servicing rights transferred to Carrington Mortgage Services, LLC ("Carrington") in October 2012, when BONY transferred the Loan to Stanwich Mortgage Loan Trust, Series 2012-10 c/o Christiana Trust, a Division of Wilmington Savings Fund Society, FSB as Trustee. Carrington serviced the Loan from approximately October 2012 to July 2014, when BSI again began servicing the Loan. The Loan's terms required that Plaintiffs make monthly payments of $1,730.29 (Dkt. #59, Exhibit 1).

Incident to the Loan, through the Deed of Trust, Plaintiffs agreed, *inter alia*, to maintain hazard insurance on the Property. Specifically, Plaintiffs agreed as follows in the Deed of Trust, Covenant Five:

> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. . . .
>
> ***If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense***. . . . Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. . . .

> *All insurance policies* required by Lender *and renewals of such policies* shall be subject to Lender's right to disapprove such policies, *shall include a standard mortgage clause*, *and shall name Lender as mortgagee and/or as an additional loss payee*. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

(Dkt. #56, Exhibit B at 6) (emphasis added). Plaintiffs reaffirmed their agreement to such terms in the Lender Placed Homeowner's Insurance Letter, signed contemporaneously with the Loan, and which provides in whole as follows:

> The undersigned Mortgagors of this loan, acknowledge that under the terms of the Deed to Secure Debt, Security Deed, Deed of Trust or Mortgage granted to the Mortgagee, its Successors and/or Assigns, that the Mortgagors are obligated to keep all improvements on the real property insured and to furnish a loss payable clause to the Mortgagee.
>
> The undersigned acknowledges that failure to provide such insurance shall authorize the Mortgagee, its Successors and/or Assigns, to cause said property to be insured, pay the premium and to add said premium to the unpaid balance, as provided in the Deed to Secure Debt, Security Deed, Deed of Trust or Mortgage. Nothing herein shall amend or change in any way any terms or provisions of the security instrument.

(Dkt. #56, Exhibit C). The Parties do not dispute that, prior to October 15, 2010, Plaintiffs held compliant hazard insurance on the Property.

On October 15, 2010, however, Plaintiffs' coverage lapsed (Dkt. #56, Exhibit E). It is unclear whether Plaintiffs had any coverage at all between October 15, 2010, and November 30, 2010, but the record reflects Plaintiffs obtained coverage for the period of December 1, 2010, to December 1, 2011, on December 3, 2010 (Dkt. #59, Exhibit 43). Nearly a year after the lapse, on October 17, 2011, BSI sent Plaintiffs a letter indicating it "ha[d] not received [their] renewal insurance policy or [the] policy has cancelled as of . . . 10/15/2011"

(Dkt. #56, Exhibit F). The letter also noted "Protium Grantor Trust c/o BSI should be listed as Mortgagee" on the policy and warned that BSI could force-place insurance and charge Plaintiffs for the premium pursuant to the Loan's terms (Dkt. #56, Exhibit F). BSI sent a follow-up letter reiterating these admonishments on November 14, 2011 (Dkt. #56, Exhibit G). Subsequently, on November 28, 2011, BSI force-placed insurance for the Property for the period of October 15, 2011, to October 15, 2012 (Dkt. #56, Exhibits H, I). BSI added the insurance premium amount to the Loan's principal as additional debt, resulting in an increase in Plaintiffs' monthly mortgage payment of $159.73, to a new monthly payment of $1,890.02 (Dkt. #56, Exhibits R, J, K).[1]

While Plaintiffs renewed coverage on December 1, 2011, the record currently before the Court does not reflect that Plaintiffs obtained a compliant loss payable clause (i.e., that they listed BSI as mortgagee) until July 30, 2012 (Dkt. #56, Exhibits M, N). BSI admits it received proof of the compliant insurance coverage in September 2012 (Dkt. #59, Exhibit 35),[2] but the record reflects that BSI continued to bill Plaintiffs for the force-placed insurance through at least the end of October 2012 (Dkt. #59, Exhibit 17). BSI later refunded Plaintiffs' account (at the time with Carrington) $833.94 on November 1, 2012; this amount reflects what BSI determined was the "unearned" portion of the additional debt corresponding to the period for which Plaintiffs had

---

[1] BSI asserts it sent Plaintiffs the three letters referenced in the text, dated October 17, 2011, November 14, 2011, and November 28, 2011, respectively, indicating it had not received proof of compliant hazard insurance from Plaintiffs as of October 15, 2011 (Dkt. #56, Exhibits F, G, I). Plaintiffs dispute this, claiming they never received such letters and also that BSI advised it was aware compliant insurance was in place but that it takes several months for its systems to catch up. Whether BSI sent such letters and/or whether Plaintiffs received such letters has no impact on the instant objections; accordingly, the Court assumes Plaintiffs never received such letters.

[2] The Court notes Plaintiffs may have provided proof of hazard insurance for the period of October 1, 2011, to October 1, 2012, as early as April 27, 2012 (Dkt. #59, Exhibit 11). The record reflects, however, that this same insurance policy did not become compliant with the Loan's terms until July 30, 2012, when the additional loss payee was added to the policy (see Dkt. #56, Exhibit M). Accordingly, even were the Court to draw all reasonable inferences in Plaintiffs' favor from the evidence, the Court may presume that BSI received proof of *compliant* insurance at the earliest on July 30, 2012.

obtained compliant insurance overlapping with the force-placed insurance (Dkt. #56, Exhibit O; Dkt. #64, Exhibit 4). Throughout this time, Plaintiffs aver, they continued to pay the original monthly payment amount of $1,730.29 (Dkt. #59, Exhibit 11). BSI assessed "late charges and other charges" as a result, and "plac[ed] the insufficient payments"—those payments of less than the $1,890.02—"into suspense" (Dkt. #56 at 6). This caused Plaintiffs' Loan to fall "two months in arrears" by the time BSI transferred the loan to Carrington, according to BSI (Dkt. #56 at 6).

As noted, Carrington began servicing the Loan in late October 2012 (*see* Dkt. #64, Exhibit 12).[3] For its part, Carrington issued a refund check to Plaintiffs totaling $749.88 on January 8, 2013, after having received the refund to Plaintiffs' account from BSI (Dkt. #55, Exhibit 9). Seemingly, Carrington issued this amount as a refund for the force-placed insurance charges BSI assessed against Plaintiffs' account (*see* Dkt. #55 at 9 ("Within a few months of when Carrington began servicing the [Loan], BSI sent Carrington money pertaining to the [Loan], and Carrington sent Plaintiffs a check [for] $749.88"). Nevertheless, Carrington continued to attempt to collect late charges BSI had assessed to Plaintiffs' account, having determined upon receipt of the Loan that the Loan was four months in arrears (Dkt. #64, Exhibit 21).[4] Carrington's representative Justin Covington testified that Carrington relied on BSI's representations regarding Plaintiffs' account given that Carrington was "at the mercy of the data, images, histories provided by the prior servicer" because "at th[e] time [Carrington] didn't have any BSI contacts" (Dkt. #64, Exhibit 13 at 107-08). In his own words, Carrington's representatives were "stuck with information that was provided to [Carrington by BSI] as well as any other information or proof

---

[3] The record does not reveal whether the mortgage payment amounts Plaintiffs had paid to BSI prior to transfer but that BSI held in suspense—$1,730.29 per month from April 2012 to October 2012—transferred with the Loan to Carrington.

[4] The Court notes Carrington and BSI apparently reached different conclusions about the degree of Plaintiffs' alleged delinquency, as BSI indicates the Loan was two months in arrears at transfer, while Carrington avers four months.

that the borrower had submitted to [Carrington]" (Dkt. #64, Exhibit 13 at 108). Another of Carrington's representatives, Dora Hernandez, testified likewise that, at the time, when a borrower disputed information associated with an account Carrington had inherited from a previous servicer, it was "difficult" for Carrington representatives to ameliorate or address the error, as they "only ha[d] certain information . . . provided to [them] by the prior servicer" (Dkt. #64, Exhibit 15 at 17). According to Mark Madden ("Madden"), a Default Mediation Manager for Carrington, Carrington continued to attempt to collect the late fees assessed by BSI on the basis of records Carrington received from BSI (Dkt. #55, Exhibit 12). Moreover, Madden averred Plaintiffs "never paid the amount necessary to cure the past due arrearage that existed when Carrington began servicing the note" and, as a result, remained "a few months in arrears when Carrington stopped servicing the Note on June 30, 2014" (Dkt. #55, Exhibit 12 at 2).

During the period Carrington serviced Plaintiffs' Loan, Carrington also erroneously determined (and reported) that Plaintiffs had filed for bankruptcy (Dkt. #55, Exhibit 12). Specifically, Carrington's records indicate that, in January 2013, Carrington believed Plaintiff Hernandez had filed for bankruptcy in California (Dkt. #64, Exhibit 14 at 5). Carrington did not realize its error (that Plaintiff Hernandez had not, in fact, filed for bankruptcy) until July 2013 (Dkt. #64, Exhibit 14 at 47). Carrington provides conflicting representations about whether it has ceased reporting that Plaintiffs are in active bankruptcy (*compare* Dkt. #55, Exhibit 12 at 2, *with* Dkt. #64, Exhibit 6 at 190-91). Further, Carrington represented in a letter to Plaintiffs dated June 21, 2013, that "[Carrington] has determined that the information reported to the credit bureaus by [Carrington] accurately reflects [Plaintiffs'] loan information and payment history"; in no uncertain terms the letter concludes "[a]ll information previously reported is accurate; therefore, the credit reporting remains unchanged" (Dkt. #64, Exhibit 21).

Plaintiffs assert Defendants BSI and Carrington each are liable for (1) breach of contract, (2) negligence and/or gross negligence, (3) violating the TDCA, and (4) violating RESPA[5] (Dkt. #61).  Specifically as to breach of contract, Plaintiffs allege, *inter alia*, that BSI improperly force-placed insurance on the Property, that Carrington improperly "charged Plaintiffs' Loan for the insurance premiums" and "reported Plaintiffs' Loan in active bankruptcy[,]" and that each of Defendants "consistently charged Plaintiffs for the premiums, never corrected Plaintiffs' Loan, . . . [and] assessed late fees and penalties" inappropriately (Dkt. #61 at 8).  As to negligence and/or gross negligence, Plaintiffs emphasize Defendants' repeated failures to remedy erroneous records associated with Plaintiffs' Loan and/or to correct alleged misrepresentations to external credit reporting entities (Dkt. #61 at 9-10).  Plaintiffs rely on Defendants' issuance of collection notices and/or balance statements misstating the amount owed on their Loan in support of their TDCA claim (Dkt. #61 at 11-12).  Finally, though Plaintiffs have withdrawn their RESPA claim against BSI (Dkt. #59 at 26), they assert Carrington violated RESPA during the period in which Carrington serviced Plaintiffs' Loan (*see* Dkt. #64 at 19).  Plaintiffs seek actual damages and injunctive relief for these claims, among other relief (Dkt. #61 at 14-17).  BSI and Carrington each seek summary judgment against Plaintiffs (Dkts. #55-56).

On February 2, 2017, the Magistrate Judge entered a report and recommendation (Dkt. #98) recommending that BSI's Motion for Summary Judgment (Dkt. #56) and Motion to Strike (Dkt. #79) each be granted in part and denied in part.  BSI and Plaintiffs each filed objections to the report on February 16, 2017 (Dkts. #112-13).  Subsequently, BSI filed a response to Plaintiff's objections on March 1, 2017 (Dkt. #116), and Plaintiffs filed a response to BSI's objections on March 2, 2017 (Dkt. #117).  On February 6, 2017, the Magistrate Judge entered a

---

[5] As the Magistrate Judge noted, Plaintiffs have withdrawn their RESPA claim against BSI (Dkt. #98 at 15 (citing Dkt. #59 at 26)).

report and recommendation (Dkt. #101) recommending that Carrington's Motion for Summary Judgment (Dkt. #55) and Motion to Strike (Dkt. #78) each be granted in part and denied in part. Carrington and Plaintiffs each filed objections to the report; Carrington on February 20, 2017 (Dkt. #114), and Plaintiffs on February 21, 2017 (Dkt. #115). Subsequently, Carrington filed a response to Plaintiff's objections on March 3, 2017 (Dkt. #118), and Plaintiffs filed a response to Carrington's objections on April 13, 2017 (Dkt. #130).

## OBJECTIONS

A party who files timely written objections to a magistrate judge's report and recommendation is entitled to a de novo review of those findings or recommendations to which the party specifically objects. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(2)-(3). In the present case, each of Defendants BSI and Carrington and Plaintiffs have filed objections to the Magistrate Judge's reports (Dkts. #112-15). The Parties filed these objections separately, but because the objections (and the Magistrate Judge's recommendations) largely overlap, the Court addresses them together here.

The Magistrate Judge's reports each concluded that Defendants' respective objections to Plaintiffs' summary judgment evidence should be sustained in part and overruled in part (Dkt. #98 at 6-15; Dkt. #101 at 6-10). The Magistrate Judge also determined that Plaintiffs had withdrawn and/or failed to plead claims under the Fair Credit Reporting Act ("FCRA") and/or the Real Estate Settlement Procedure Act ("RESPA") against BSI and, accordingly, that such claims should be dismissed (Dkt. #98 at 15). Finally, the Magistrate Judge found (A) Plaintiffs' breach of contract claims against both BSI and Carrington should survive summary judgment (Dkt. #98 at 16-20; Dkt. #101 at 10-12), (B) Plaintiffs' TDCA claims against both BSI and Carrington should survive summary judgment (Dkt. #98 at 20-22; Dkt. #101 at 12-14), (C) Plaintiffs' negligence and/or gross

negligence claims against both BSI and Carrington should be dismissed (Dkt. #98 at 22-25; Dkt. #101 at 14-18), (D) Plaintiffs' RESPA claim against Carrington should be dismissed (Dkt. #101 at 18-19), and (E) Plaintiffs' injunctive relief claims against both BSI and Carrington should survive summary judgment (Dkt. #98 at 26; Dkt. #101 at 19). BSI specifically objects only to the Magistrate Judge's breach of contract findings (Dkt. #112), while Carrington objects to the Magistrate Judge's breach of contract, TDCA, and injunctive relief findings (Dkt. #114). Plaintiffs object only to the Magistrate Judge's negligence/gross negligence findings (Dkt. #113; Dkt. #115). No Party objects to the Magistrate Judge's findings regarding Defendants' objections to Plaintiffs' Summary Judgment Evidence and/or Plaintiffs' FCRA and RESPA claims. As such, the Court adopts these findings and proceeds to evaluate (1) the breach of contract findings regarding BSI and Carrington, (2) the TDCA findings regarding Carrington, (3) the injunctive relief findings regarding Carrington, and (4) the negligence/gross negligence findings regarding BSI and Carrington.

### 1.    *Breach of Contract Findings*

Defendants object that the Magistrate Judge erred in finding Defendants' respective Motions for Summary Judgment as to Plaintiffs' breach of contract claims should be denied. Specifically, Defendants point to the Loan's Covenant Five as well as the Lender Placed Homeowner's Insurance Letter and assert the summary judgment evidence establishes Plaintiffs did not comply with the agreements contained therein because they failed to maintain compliant hazard insurance on the Property for a period of time (Dkt. #112; Dkt. #114). Accordingly, Defendants argue, Plaintiffs did not "perform" under the contract they allege Defendants breached and, further, that the Magistrate Judge relied in part on stricken evidence in finding Plaintiffs' breach of contract claim should survive summary judgment. As a result, Defendants assert,

Plaintiffs cannot establish every element of their breach of contract claim (Dkt. #112; Dkt. #114). Plaintiffs argue in response that the Magistrate Judge correctly found that "BSI's right to force place insurance . . . is only triggered if Plaintiffs fail to maintain insurance" and that, even if they did fail to maintain insurance, such would not preclude their breach of contract claim (Dkt. #117; *see* Dkt. #130 at 2-5).

As an initial matter, the Court finds, contrary to the Magistrate Judge, that Plaintiffs did not comply with Covenant Five during the entire period relevant herein. Specifically, from December 1, 2010, to July 30, 2012, Plaintiffs' hazard insurance policy did not, as required, name an additional loss payee. Only when Plaintiffs amended the policy to name an additional loss payee on July 30, 2012, did Plaintiffs come into full compliance with Covenant Five and the Lender Placed Homeowner's Insurance Letter terms. The Magistrate Judge, in consideration of the arguments raised by the Parties, determined such failure did not preclude Plaintiffs' breach of contract claim (in reliance upon persuasive but largely out-of-circuit authority) (*see* Dkt. #98 at 17-19 & n.6; Dkt. #101 at 11 n.6). Defendants argue vehemently in their objections against the Magistrate Judge's conclusion, but fail to cite any authority addressing this issue particularly (*see* Dkt. #112 at 1-4 (arguing BSI complied with RESPA in force-placing insurance and attempting to distinguish the Magistrate Judge's cited authorities on procedural grounds); Dkt. #114 at 3-4 (citing two cases for the proposition that failure to include a loss payable clause constitutes a material breach and attempting to distinguish the Magistrate Judge's cited authorities on factual grounds)). In conducting its own independent research, the Court has determined the Magistrate Judge's underlying analysis of Plaintiffs' breach of contract claim related to the issue of designating a loss payee is partially in error. Courts in this circuit have held under similar circumstances—where a plaintiff has failed to comply strictly with the terms of loan covenants

regarding maintenance of insurance—that plaintiffs fail to state a breach of contract claim. *See, e.g.*, *Smith v. JPMorgan Chase Bank, N.A.*, No. 4:10-CV-533, 2011 WL 6217783, at *4 (E.D. Tex. Dec. 14, 2011), *report and recommendation adopted*, No. 4:10-CV-533, 2012 WL 966485 (E.D. Tex. Mar. 20, 2012) (relying on similar Deed of Trust language in finding defendants did not breach any agreement by force-placing insurance when plaintiffs allowed the policy to lapse), *aff'd Smith v. JPMorgan Chase Bank, N.A.*, 519 F. App'x 861, 863-64 (5th Cir. 2013) (per curiam) (finding defendants "acted within the terms of the contract" in force-placing insurance); *Neel v. Fannie Mae*, No. 1:12CV311-HSO-RHW, 2014 WL 977328, at *6 (S.D. Miss. Mar. 12, 2014) (finding that "simply having insurance on the [p]roperty [at issue], notwithstanding . . . that the insurance did not comply with the specific terms of the Deed of Trust"—namely because it failed to "name any additional loss payees"—could not sustain the plaintiffs' claim for breach of contract as against a motion for summary judgment); *Fraley v. BAC Home Loans Servicing, LP*, No. 3:11-CV-1060-N-BK, 2013 WL 3878683, at *3 (N.D. Tex. July 29, 2013) (finding the mere failure to provide proof of compliant hazard insurance sufficient to preclude breach of contract claim based upon lender's force-placing hazard insurance on the property). Finding these cases persuasive, the Court must find Plaintiffs state no breach of contract claim for the period in which Plaintiffs did not have and/or did not furnish compliant hazard insurance for the Property (i.e., when no loss payee was designated).

Notwithstanding such finding, the record (read in a light most favorable to Plaintiffs) reveals that BSI by its own admission received proof of compliant hazard insurance in September 2012 (for the period of July 30, 2012, when the additional loss payee was named, to December 1, 2012, when the policy would expire) (Dkt. #59, Exhibit 35). Yet BSI continued to charge Plaintiffs' account for the force-placed insurance premium through at least Plaintiffs'

October 19, 2012 statement (Dkt. #59, Exhibit 17).[6] Further, though BSI insists it refunded Plaintiffs for the "unearned" portion of the force-placed hazard insurance premium, BSI fails to demonstrate how it calculated what portion of the premium was "unearned" and admitted at deposition it did not understand its own billing calculations on the assessments reflected in such invoices (Dkt. #59, Exhibit 33 (When asked about apparent discrepancies in the force-placed insurance charges in Plaintiffs' billing statements from BSI, Trevor Hanna, corporate representative of BSI, responded, "I don't know why it would go from 100 to 201. It doesn't show it on – I'm not sure why it would go from 100 to 200.")). BSI's own averments show alleged billing errors caused Plaintiffs' account to continue to appear delinquent after Plaintiffs were fully in compliance and also that BSI held Plaintiffs' monthly $1,730.29 payments in suspense when received, and thus Plaintiffs' account continued to incur late fees and other charges (Dkt. #56 at 6). Indeed, beginning in April 2012, BSI claims it accepted but held Plaintiffs' monthly payments in suspense—i.e., did not apply the payments to the amounts due each month—and only "when enough money was in the suspense account sufficient to make a payment and advance the loan" would it credit Plaintiffs' account (Dkt. #56 at 6). BSI apparently continued this practice and failed to ameliorate and/or examine these calculations and potential billing errors during the time it serviced the Loan notwithstanding Plaintiffs' frequent contacts with BSI regarding the billing issues (beginning in April 2012, when Plaintiffs claim they first received a bill with the force-placed insurance charges) (Dkt. #59, Exhibit 11). The record indicates BSI also failed to correct the alleged errors prior to transferring the Loan to Carrington in late October 2012, as Carrington avers it received the loan "several months in arrears" (Dkt. #55, Exhibit 12).

---

[6] BSI may have continued to bill Plaintiffs for the force-placed insurance for a longer period, but the record is unclear on this point.

Carrington also continued attempting to collect the late fees and other charges assigned by BSI throughout the time Carrington held the Loan and averred the Loan remained delinquent during the same period (Dkt. #55, Exhibit 12). Plaintiffs attempted numerous times to contact Carrington to fix the errors they perceived in their billing statements; each time they did so, however, Plaintiffs claim Carrington would either forward Plaintiffs' call to Carrington's bankruptcy department and/or tell Plaintiffs "all of the fees [in the statements] were proper, [Plaintiffs'] account was past due, and [Carrington] would not correct [Plaintiffs'] credit reports" (Dkt. #59, Exhibit 7). Moreover, Carrington representatives testified that, assuming Plaintiffs had attempted to provide proof to Carrington that the billing statements had errors (as Plaintiffs assert they did), it still would have been "difficult" to remedy the problem because the Carrington representatives responsible for such troubleshooting had no access to necessary contacts at BSI who could verify or contest Plaintiffs' explanations regarding the purported billing errors (Dkt. #64, Exhibit 15). In other words, once Carrington received the Loan from BSI, Carrington was "at the mercy of the data, images, [and] histories provided by [BSI in the transfer]" to determine how to handle "any situations" that arose when BSI serviced the Loan (Dkt. #64, Exhibit 13).

The Northern District of Texas Bankruptcy Court found in *In re Rosetti*, No. 06-43810-DML-13, 2008 WL 2559193 (N.D. Tex. June 19, 2008), that similar circumstances precluded summary judgment against the plaintiffs on their breach of contract claim. The plaintiffs in *Rosetti* allowed required insurance on their property to lapse for a thirteen-day period (from November 20, 2003, to December 3, 2003) and, according to the lender-defendant, failed to send proof of their renewed, compliant insurance. 2008 WL 2559193, at *2. On March 5, 2004, the lender force-placed insurance on the property; the lender notified the plaintiffs on March 22, 2004, that their

monthly mortgage payments would increase in May 2004 as a result. *Id.* Plaintiffs responded four days later with a letter denying receipt of any previous notice regarding failure to maintain insurance and providing proof of compliant insurance for a period beginning on December 3, 2003. *Id.* The lender then refunded plaintiffs' account for the amount of the force-placed premium, except the portion covering the thirteen-day lapse. *Id.* at *3. Nevertheless, the Court noted, "billing issues continued into late September" incident to the "insurance mix-up . . . ." *Id.* The Court accordingly found that "[a]lthough Chase appears to have resolved the insurance mix-up within a reasonable time, questions of fact exist as to the nature of the apparent billing errors, the existence and timing of certain communications, and the reasonableness of the overall time involved in completely resolving the billing problems" such that "[the lender] failed to show that it [was] entitled to judgment as a matter of law on [the] breach of contract claim." *Id.* at *5.

Likewise here, BSI arguably attempted to address the insurance "mix-up" by providing a refund to Plaintiffs' account after Plaintiffs provided proof of the compliant insurance in September 2012. But like the lender in *Rosetti*, BSI continued to include a charge on Plaintiffs' billing statements for the force-placed insurance after it received notice Plaintiffs had acquired compliant insurance for the Property and the billing issues on Plaintiffs' account were not fully resolved and continued even once BSI transferred the Loan to Carrington. Plaintiffs aver BSI "continued to report us as late, and past due despite [Plaintiffs'] continuing to try and get BSI to understand the errors" once BSI began servicing the Loan again in 2014 (Dkt. #59, Exhibit 11). With regard to BSI's servicing Plaintiffs' Loan, then, fact questions exist as to "the apparent billing errors" and "the reasonableness of the overall time involved in completely resolving the billing problems" for Plaintiffs. *See Rosetti*, 2008 WL 2559193, at *5. This error remained on Plaintiffs' account when the Loan transferred to Carrington, and Carrington indicates it relied on BSI's

representations throughout the time it serviced Plaintiffs' Loan in maintaining its billing records. As in *Rosetti*, "[t]here is no question that [Plaintiffs] ha[ve] established that [they] and [Defendants] disagree about whether [Plaintiffs were] given proper credit for all payments and escrow transactions." *See id.* Furthermore, given the period of time the alleged billing errors went unresolved while Carrington serviced Plaintiffs' Loan—approximately nineteen months, from October 2012 to June 2014—Plaintiffs have successfully raised fact questions as to Carrington's perpetuation of "the apparent billing errors" and "the reasonableness of the overall time involved in completely resolving the billing problems." *See id.* And the record reflects this disagreement is genuine and material. Accordingly, though Plaintiffs cannot establish on the present record that BSI breached the Loan terms by force-placing insurance (and charging Plaintiffs) for the premium for the period of October 15, 2011, to July 30, 2012, Plaintiffs do raise a genuine issue of material fact as to whether BSI breached the Loan terms by continuing to bill Plaintiffs for the force-placed insurance after receiving notice Plaintiffs had acquired compliant insurance and in failing to adequately address the associated billing issues. Plaintiffs also raise a genuine issue of material fact as to whether Carrington breached the Loan terms by continuing to represent in billing statements to Plaintiffs that Plaintiffs' account was in arrears. The Court thus continues to find summary judgment on Plaintiffs' breach of contract claims inappropriate.[7]

## 2. *TDCA Findings*

Carrington objects that the Magistrate Judge erred in finding Plaintiffs' TDCA claims against Carrington should survive summary judgment (Dkt. #114 at 7-11). Carrington argues it

---

[7] The Court notes it reaches the same conclusion as the Magistrate Judge, albeit through a narrower interpretation of Plaintiffs' arguments. Plaintiffs argue generally that they performed under the Loan's terms, and accordingly that Defendants breached the Loan's terms by force-placing insurance and charging Plaintiffs late and other fees for their nonpayment of the force-placed insurance costs. Through this broader argument, Plaintiffs necessarily argue they performed for each discrete period identified herein: before July 30, 2012, and after July 30, 2012. Because the Court finds Plaintiffs performed pursuant to the Loan's terms as of July 30, 2012, the Court finds Plaintiffs raise a fact issue as to their breach of contract claim.

cannot have misrepresented the amounts Plaintiffs owed on billing statements to Plaintiffs because BSI was contractually authorized to force-place insurance on the Property as it did. Carrington also asserts Plaintiffs only pleaded one factual theory, namely "misrepresent[ation of] the amount of Plaintiffs' debt[,]" in their amended complaint such that the "new, laundry list of allegations" to support other factual theories of a TDCA violation in Plaintiffs' Reply to Carrington's Motion for Summary Judgment should be disregarded and, in any event, fail to state a claim. Lastly, Carrington contends Plaintiffs fail to plead actual damages pursuant to the TDCA or a right to injunctive relief for an ongoing violation of the TDCA on Carrington's part and that, accordingly, Plaintiffs' claim should be dismissed. Plaintiffs argue in response BSI had no authority to force-place insurance on the Property, that they included the allegations raised in the Reply to support their misrepresentation theory of recovery and not to allege a new cause of action, and that they pleaded for actual damages and proper injunctive relief in their amended complaint (Dkt. #130 at 5-8).

The Court found *supra* that Plaintiffs raise a genuine issue of material fact as to whether Carrington improperly billed Plaintiffs for various late fees and other charges throughout the period Carrington serviced the Loan. Furthermore, Carrington admits it erroneously flagged (and reported to credit agencies) Plaintiff Hernandez as being in active bankruptcy in early 2013 (Dkt. #55, Exhibit 12 at 2; *see also* Dkt. #64, Exhibit 14 at 5, 47-48). Nevertheless, Carrington sent Plaintiffs a letter dated June 21, 2013, indicating Carrington had determined it made no mistake about Plaintiffs' account:

> The January 4, 2013 mortgage statement was correct and no errors were made by CMS; therefore, no derogatory entries on your clients' credit history will be removed. . . . CMS has determined that the information reported to the credit bureaus by CMS accurately reflects your clients' loan information and payment history. All information previously reported is accurate; therefore, the credit reporting remains unchanged.

(Dkt. #64, Exhibit 21).  As the Magistrate Judge noted, "[a] collection notice or balance statement misstating the amount owed on a debt constitutes a misleading assertion regarding the amount of that debt under the TDCA." *See Baker v. Countrywide Home Loans, Inc.*, 3-08-cv-0916-B, 2009 WL 1810336, at *7 (N.D. Tex. June 24, 2009); *see also VanHauen v. Am. Home Mortg. Servicing, Inc.*, No. 4:11-cv-461, 2012 WL 874330, at *5 (E.D. Tex. Feb. 17, 2012) (Mazzant, M.J.).  Because Plaintiffs raise a fact issue as to whether Carrington issued collection notices and billing statements to Plaintiffs that contained erroneous information about the amount Plaintiffs owed, Plaintiffs also raise a fact issue regarding whether Carrington committed an actionable misrepresentation under the TDCA.  Plaintiffs also raise a fact issue regarding whether Carrington committed an actionable misrepresentation under the TDCA through the June 21, 2013 letter, which misrepresents to Plaintiffs directly (through their counsel) the status of their Loan.  Finally, though Carrington correctly states Plaintiffs do not articulate or prove an ongoing TDCA violation on Carrington's part, Plaintiffs clearly seek "actual damages" in their amended complaint (Dkt. #61 at 17), and the summary judgment evidence establishes a nexus between Carrington's (and BSI's) purported misrepresentations on the bills sent to Plaintiffs and Plaintiffs' alleged damages (*see* Dkt. #64, Exhibit 7).  The Court overrules this objection.

### 3.  *Injunctive Relief Findings*

The Magistrate Judge found Plaintiffs appropriately sought the following forms of injunctive relief: "an injunction ordering Carrington to [1] request to confirm the removal of all negative trade lines on Plaintiffs' credit related to the Loan, [2] notify all of the third-parties that Carrington falsely communicated any alleged missed payments or bankruptcy otherwise related to the Loan that any allegations were a mistake, [3] remove all late fees, and all other charges on Plaintiffs' Loan related to or as a result of the wrongful reporting of the alleged 'default' and

'alleged bankruptcy'" (Dkt. #101 at 19 (citing Dkt. #61 at 14)). Carrington objects that the Magistrate Judge erred in finding Plaintiffs' claims for injunctive relief against Carrington should survive summary judgment (Dkt. #114 at 11-13). Carrington argues "Plaintiffs cannot rely on their breach of contract claim" because they "have failed to show a probable right to relief on [this] cause of action" and because the "requested injunctive relief has no relationship whatsoever to any of Carrington's obligations" under the Loan. Carrington also reiterates its arguments regarding Plaintiffs' claim for injunctive relief under the TDCA, if any. Plaintiffs contend in response that the Magistrate Judge appropriately found "Plaintiffs [could be] entitled to injunctive relief . . . ordering Carrington to request to 'confirm the removal of all negative trade lines of Plaintiffs' credit related to their Loan, [and to] notify all third[-]parties that Carrington falsely communicated any alleged missed payments or bankruptcy'" (Dkt. #130 at 7). Plaintiffs argue they state a claim for such relief because Carrington cannot confirm it has ceased its erroneous reporting to credit agencies and because Carrington suffers no harm from the Court's ordering such relief (Dkt. #130 at 7-8).

As noted *supra*, Plaintiffs have raised a genuine issue of material fact as to their claims against BSI and Carrington for breach of contract. Further, Plaintiffs' first two requests for injunctive relief (i.e., the requests that Carrington confirm removal of all negative trade lines associated with the Loan and that Carrington notify third-parties of its mistake regarding the reported bankruptcy), request prospective relief related to an ongoing harm arising out of the alleged contract breach. *Cf. Sheils v. Bucks Cty. Domestic Relations Section*, 921 F. Supp. 2d 396, 410-11 (E.D. Pa. 2013) (finding in *Younger* abstention context that a plaintiff's allegations relating to "the reporting of information to credit reporting bureaus" were ongoing and formed part of the basis of the plaintiff's "prospective declaratory and injunctive relief"). The Court agrees with

Carrington, however, that Plaintiffs' third request, asking that the Court order Carrington to "remove all late fees, and all other charges on Plaintiffs' Loan[,]" does not constitute a proper request for injunctive relief. Accordingly, the Court sustains Carrington's objection in part (Plaintiffs' third request for injunctive relief should be denied) and overrules it in part (Plaintiffs' first and second requests for injunctive relief should survive summary judgment).

### 4.     *Negligence and Gross Negligence Findings*

Plaintiffs object that the Magistrate Judge erred in "finding[] that Plaintiffs' injuries . . . are not independent from the deed of trust that forms the basis of Plaintiff's [sic] breach of contract claim" and in "finding[] that Plaintiffs' claims of negligence and gross negligence (and damages resulting therefrom) are barred by the economic loss doctrine" (Dkt. #113; Dkt. #115). Plaintiffs argue that, when one pleads "damages that do not include the benefit of [the] contract . . . , the damages [associated therewith] are not barred by the economic loss doctrine[,]" citing *Neresova v. Suntrust Mortg., Inc.*, No. 3:11-cv-976-BH, 2011 WL 13127891 (N.D. Tex. Nov. 16, 2011), which in turn cites *In re Thrash*, 433 B.R. 585 (N.D. Tex. 2010) (Dkt. #113 at 4). Plaintiffs then point to their requests for injunctive relief tied to the alleged negligence and enumerate specific examples of mental anguish damages they believe place their claim outside of the economic loss rule's bar, namely mental anguish "caused . . . because [Plaintiffs] have no control over BSI [sic] reporting on their credit" and because they do not know "when the negative reporting will ever end[,]" caused by BSI's continued refusal "to correct their account[,]" caused by "knowing . . . BSI will continue the constant collections, the past due letters, the foreclosure notices, and negative credit reporting[,]" and caused by "banks refusing to refinance" the Loan "due to the reporting of Plaintiffs['] 'default'" (Dkt. #113 at 5). BSI argues the Magistrate Judge appropriately found (1) "Texas law imposes no special or fiduciary relationship between a mortgage servicer and

borrower or lender and borrower" and (2) Plaintiffs fail to proffer evidence that their pleaded damages fall outside of the economic loss rule's bar (Dkt. #116). Carrington echoes BSI's arguments and further asserts Plaintiffs raise no negligent misrepresentation claim (Dkt. #118).

Initially, the Court notes that, although the Magistrate Judge found "Texas law imposes 'no "special" or fiduciary relationship between a mortgage servicer and borrower or a lender and borrower,'" the Magistrate Judge also expressly found "a lender may still owe a borrower the duty to exercise reasonable care to avoid a foreseeable risk of injury to the borrower" (Dkt. #98 at 22 (citing *Neresova*, 2011 WL 13127891, at *5)). The Magistrate Judge then found that, regardless of any duty allegedly owed, "a plaintiff must also raise a genuine issue of material fact as to damages not barred by the economic loss rule in order to survive dismissal" (Dkt. #98 at 23). The Magistrate Judge turned to the applicability of the economic loss rule as a result (*see* Dkt. #98 at 22-26; Dkt. #101 at 14-15).

Under the economic loss rule, a plaintiff fails to create a fact question as to negligence (or its various iterations) only where the plaintiff has pleaded and proved damages wholly barred by the economic loss rule. *See, e.g.*, *In re Thrash*, 433 B.R. at 598-99 (negligence claim); *Avila v. JPMorgan Chase Bank, N.A.*, No. H-14-3502, 2015 WL 1648940, at *2-3 & n.13 (S.D. Tex. Apr. 13, 2015) (negligence and negligent misrepresentation); *Madison v. James B. Nutter & Co.*, No. Civ.A. H-13-3020, 2014 WL 7338853, at *6 (S.D. Tex. Dec. 22, 2014) (negligence). The economic loss rule precludes tort damages where "the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement," or, in other words, because it breaches "[the] contract exist[ing] between the parties[] . . . ." *Avila*, 2015 WL 1648940, at *2-3 (quoting *Owens v. BAC Home Loans Servicing, L.P.*, No. H-11-2742, 2013 WL 1345209, at *4 (S.D. Tex. Mar. 30, 2013)).

As discussed *supra*, Plaintiffs' claim for breach of contract arises out of BSI's force-placing insurance on their account as well as BSI's "consistently charg[ing] Plaintiffs for the premiums, never correct[ing] Plaintiffs' Loan, . . . [and] assess[ing] late fees and penalties" to Plaintiffs' account (Dkt. #61). In support of their negligence and/or gross negligence claims, Plaintiffs plead and offer evidence that Defendants' "report[ing] Plaintiffs' Loan was in default" and "repeatedly report[ing] that Plaintiffs failed to make a payment on their Loan for 30, 60, and 90 days" led to the destruction of Plaintiffs' credit (Dkt. #61 at 9-10). In their objections, Plaintiffs also further specifically identify distinct mental anguish damages and injunctive relief (Dkt. #113 at 4-6). Plaintiffs argue their "mental anguish damages . . . stem[] from Plaintiffs [sic] knowing that although they fully comply with their loan obligations each month, BSI continues to report the loan delinquent[,]" not from BSI's consistently charging Plaintiffs late fees or from BSI's act of force-placing insurance, itself (Dkt. #113 at 4). As delineated earlier, Plaintiffs provide a laundry list of purported mental anguish damages arising from BSI's and Carrington's alleged wrongdoing (Dkt. #113 at 5; Dkt. #115 at 6)). Plaintiffs argue such damages do not stem from the economic harm caused by the failure to properly service the loan; rather, Plaintiffs assert these damages arise from Defendants' negligent failure to correct Plaintiffs' account and Defendants' continued negative reporting to crediting agencies after receiving evidence that Plaintiffs were not in default (or in bankruptcy) (*see* Dkt. #113 at 5-6 ("These are not breach of contract damages. . . . These are damages caused by BSI negligently failing to correct Plaintiffs' account after receipt of proof that Plaintiffs were in fact not in default.")). The economic loss rule does not bar these damages. Accordingly, the Court sustains Plaintiffs' objections.

In summary, the Court finds the Magistrate Judge's recommendations as to Plaintiffs' breach of contract claims should be adopted (albeit on narrower grounds) such that Plaintiffs' breach of contract claims against BSI and Carrington should proceed. The Court adopts the Magistrate Judge's recommendations regarding Plaintiffs' TDCA claims against BSI and Carrington for the reasons stated herein. The Court rejects the Magistrate Judge's findings as to Plaintiffs' negligence claims and finds those claims should proceed. Additionally, the Court finds, contrary to the Magistrate Judge, that Plaintiffs' third claim for injunctive relief against Carrington should be denied, but that each of Plaintiffs' other claims for injunctive relief against Carrington and BSI should survive summary judgment.

## CONCLUSION

Having considered each of Defendants' timely filed objections (Dkt. #112; Dkt. #114), Plaintiffs' responses thereto (Dkt. #117; Dkt. #130), each of Plaintiffs' timely filed objections (Dkt. #113; Dkt. #115), and Defendants' response thereto (Dkt. #116; Dkt. #118), and having conducted a de novo review, the Court adopts in part the Magistrate Judge's reports (Dkt. #98; Dkt. #101) as the findings and conclusions of the Court.

Accordingly, it is **ORDERED** that Defendant Carrington's Motion for Summary Judgment (Dkt. #55) is **GRANTED IN PART AND DENIED IN PART**, and that Plaintiffs' RESPA claims against Carrington are hereby dismissed. Plaintiffs' request that Carrington be ordered to "remove all late fees, and all other charges on Plaintiffs' Loan related to or as a result of the wrongful reporting of the alleged 'default' and 'alleged bankruptcy'" is hereby denied, as well. Plaintiffs' breach of contract, TDCA, negligence, and gross negligence claims against Carrington should proceed to trial, as should Plaintiffs' remaining claims for injunctive relief.

It is further **ORDERED** that Defendant BSI's Motion for Summary Judgment (Dkt. #56) is **GRANTED IN PART AND DENIED IN PART**, and that Plaintiffs' RESPA claims against BSI are hereby dismissed.  Plaintiffs' breach of contract, TDCA, negligence, and gross negligence claims against BSI should proceed to trial, as should Plaintiffs' remaining claims for injunctive relief.

**IT IS SO ORDERED**.

 **SIGNED this 20th day of June, 2017.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE